# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

BRIAN PEREZ-LOPEZ,

    Plaintiff,

    v.

OFFICER CHRISTIAN SENSAYU,
OFFICER THURMAN TYLER,
LT. JEFF KESTLER,

    Defendants.

Civil Action No.:  JRR-23-663

## MEMORANDUM OPINION

Pending in this civil rights case is Defendants' Motion to Dismiss or, In the Alternative, for Summary Judgment.  ECF 22.  Plaintiff Brian Perez-Lopez was advised of his right to file a response and his request for an extension of time to do so was granted; however, he has not filed anything further in this case.  *See* ECF 24, 25, 26.  No hearing is needed to address the matters pending.  *See* L. R. 105.6 (D. Md. 2023).  For the reasons that follow, Defendants' motion, construed as a motion for summary judgment, shall be granted.

## BACKGROUND

### A.    Complaint Allegations

Plaintiff alleges that he got into a fight with his cellmate and when officers arrived, they sprayed pepper spray into the cell.  ECF 6 at 4.  Plaintiff claims that after he and his cellmate were removed from the cell, they were handcuffed and led out of the housing unit.  *Id*.  En route, he told the officer that he has asthma and seizures.  *Id*.  He claims he asked the officer to "please stop" and to get him some medical assistance.  *Id*.  Plaintiff claims the officer told him he did not care and walked plaintiff to the medical unit.  *Id*.

Upon arrival at the medical unit, Plaintiff begged the officer to allow him to stand. *Id*. Instead, he claims the officers slammed him down, choked him, and smacked the right side of his head. *Id*. After he was taken back to his cell, Plaintiff states he was left there and, after a few minutes, he passed out and began having epileptic seizures. *Id*. at 5. Other inmates on the housing unit began kicking their cell doors to get the attention of an officer, so Plaintiff could be helped. *Id*. Five minutes later, when an officer arrived, another inmate asked the officer to get Plaintiff out of the cell and to help him. Plaintiff claims that the officer told the other inmate that Plaintiff would be okay because he was still breathing. *Id*.

Plaintiff adds that the officers did not have an excuse to choke him or to slam his head. *Id*. He claims the use of force caused him to have multiple seizures. *Id*. He adds that the incident has caused him to have anxiety and post-traumatic stress disorder. *Id*.

## B.    Defendants' Response – Assertions of Undisputed Material Facts

The following facts are undisputed and/or Plaintiff has failed to generate a dispute of fact as to the following:

On February 15, 2023, Lt. Jeff Kestler was assigned to Housing Unit 4, where Plaintiff was housed; Lt. Kestler was responsible for the daily operation of the housing unit. ECF 22-8 at 1, ¶ 2. Lt. Kestler attests that the only interaction he had with Plaintiff on the date in question was to photograph the injuries Plaintiff sustained during the fight with his cellmate; Lt. Kestler took no part in any use of force against Plaintiff. *Id*. at 2, ¶¶ 5, 6.

Officer Christian Sensayu is the officer who discovered Plaintiff and his cellmate fighting inside their cell. ECF 22-9 at 1-2, ¶ 4. He attests that on February 15, 2023, he was conducting security rounds in Housing Unit #4 when he saw the two men fighting each other. *Id*. Sensayu verbally ordered the men to stop fighting but both ignored the order. *Id*. at 2, ¶ 5. To gain their

compliance, Sensayu dispersed pepper spray into the cell through the food slot in the door.  *Id*.  Sensayu then radioed for assistance.  *Id*.

After additional officers responded to the call for assistance, Sensayu did not take part in handcuffing Plaintiff or his cellmate; and did not take part in the cell extraction or in escorting either inmate to the medical unit; nor was he present in the medical unit with Plaintiff.  *Id*. at ¶ 6.  Because Sensayu deployed pepper spray into Plaintiff's cell, he was required to write a use of force report.  *Id*. at ¶ 7.

Officer Thurman Tyler attests that he responded to Sensayu's call for assistance and, upon his arrival, witnessed Plaintiff in a fight with his cellmate.  ECF 22-10 at 1-2, ¶¶ 4-5.  Tyler banged on the cell door to get Plaintiff and his cellmate's attention, and ordered them to stop fighting.  *Id*. at 2, ¶ 5.  Tyler's order was ignored, so he also dispersed pepper spray into the cell through the food slot in the door.  *Id*.  After the pepper spray was dispersed into the cell, Plaintiff and his cellmate stopped fighting and came to the door to be handcuffed.  *Id*. at ¶ 6.  After the cell door was opened, Plaintiff and his cellmate were removed from the cell without incident.  *Id*. at ¶ 8.  Tyler escorted Plaintiff's cellmate to the medical unit.  *Id*. at ¶ 9.

Tyler attests further that he was standing just outside of the medical unit when Plaintiff became "agitated and refused direct orders to remain seated."  *Id*. at ¶ 10.  According to Tyler's declaration, Plaintiff fell to the floor when he refused to comply with orders to stay seated.  *Id*.  After he was on the floor, Tyler provided leg irons to the officers attempting to gain control of Plaintiff so he could be medically evaluated and treated.  *Id*.  After Plaintiff was restrained, his evaluation was completed without further incident.  *Id*. at ¶ 11.  Tyler attests that he did neither slammed Plaintiff to the floor or choked him.  *Id*. at ¶ 12.

Surveillance video, submitted as an exhibit by Defendants (ECF 22, Ex. 2 and Ex. 3 (filed separately), displays the following, which Plaintiff concedes and does not challenge (due to this non-response to the Motion): As the officers remove the inmates from the cell, Plaintiff can be seen falling to the floor on his back. The video does not generate a dispute as to whether officers were involved in, or caused the fall, as the video displays objectively no such image of their involvement or causative force. On the video, Plaintiff appears to have difficulty descending the stairs; officers aid and escort him down the stairs as they leave the view of the camera.

It is also undisputed that, during Plaintiff's escort to the medical unit, which is not depicted on the video surveillance, Plaintiff "was spitting and shaking his head" so Officer Healey, who was one of the officers who escorted Plaintiff, placed a spit mask on him. ECF 22-3 at 8 and 32. Healey attests that the decision to put the spit mask on Plaintiff was made while they were in the hallway outside of the medical unit to prevent Plaintiff from spitting on the officers. *Id*. at 8.

The surveillance video inside the medical unit objectively displays Plaintiff wearing a spit mask and being placed in a plastic chair. ECF 22 at Ex. 2 and Ex. 3 (filed separately). Plaintiff appears agitated and continuously moving his legs and feet. The officers present held him down by placing their hands on his shoulders, but Plaintiff's agitation did not dissipate. Rather, he continued to try to stand up and, seemingly due to the lightweight nature of the chair being used, the chair and Plaintiff toppled to the floor. While Plaintiff was on the floor, other officers who were standing in the hallway, assisted in placing leg irons on Plaintiff. He was then brought to his feet and remained in the doorway. The nurse approached with an inhaler, lifted the spit mask, and administered the inhaler treatment to Plaintiff twice. One of the officers pulled the spit mask off of Plaintiff's face just before he was escorted away from the medical room. The remainder of the

video, depicting Plaintiff's cellmate, is not relevant to this case. Plaintiff raises no challenge to, or dispute regarding, the video, what it objectively shows, or what Defendants contend in shows.

The investigatory reports pertaining to the incident document that Plaintiff "suffered a medical incident inside of his cell" later the same day, and that he was taken to "West Medical via stretcher." ECF 22-3 at 3, 5, and 23. According to the report of Mehlat Tesfaye, RN, written to document her initial contact with Plaintiff and the second encounter when she was called back to Housing Unit 4 to evaluate Plaintiff who was "unresponsive," Plaintiff was "further evaluated and assessed by provider" and subsequently escorted to the infirmary where he remained for observation. *Id.* at 23. Plaintiff raises no dispute as to these assertions of fact; therefore, they are undisputed.

## STANDARD OF REVIEW

### A.      Motion to Dismiss

Defendants' Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). Under Rule 12(b)(6), however, a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 F. App'x 220, 222 (4th Cir. Nov. 29, 2016) (*per*

*curiam*).  As is the case here, when a movant titles its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the Court's consideration, the parties are deemed on notice that conversion under Rule 12(d) may occur; the Court "does not have an obligation to notify parties of the obvious."  *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so.  *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC*, 672 F. App'x at 622 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5 C Wright & Miller, FEDERAL PRACTICE & PROC. § 1366, at 159 (3d ed. 2004, 2011 Supp.).  This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149.  In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.  *Id*. at 165, 167.

### B.    Discovery

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 F. App'x 632, 638-39 (4th Cir. July 14, 2016) (*per curiam*); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015).    However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).    To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.    FED. R. CIV. P. 56(d); *see also Harrods Ltd.*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted).    A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"  *Harrods Ltd.*, 302 F.3d at 244 (citations omitted).  Despite the absence of the non-moving party's Rule 56(d) affidavit, the Court shall not issue a summary judgment ruling that is obviously premature.  Although the Fourth Circuit places "'great weight'" on the Rule 56(d) affidavit, and holds that mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit.  *Id.* (internal citations omitted).

Failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods Ltd.*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008).  Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se."  *Putney*, 656 F. App'x at 638.

### C.    Summary Judgment

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

8

requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting FED. R. CIV. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The Court "view[s] the evidence in the light most favorable to . . . the nonmovant, and draw[s] all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002); *see FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id*. at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313

(4th Cir. 2013).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law."  *Id*. at 252.  And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id*.

Because Plaintiff is self-represented, his submissions are liberally construed.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  That notwithstanding, the Court must also abide the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'"  *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## DISCUSSION

### A.     Exhaustion of Administrative Remedies

Defendants raise the affirmative defense that Plaintiff failed to exhaust his administrative remedies.  If Plaintiff's claim has not been properly presented through the administrative remedy procedure, it must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e.  The PLRA provides in pertinent part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."  42 U.S.C. § 1997e(h).  The phrase "prison conditions" encompasses "all

inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003), *aff'd*, 98 Fed. App'x. 253 (4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by the defendant. *See Jones v. Bock*, 549 U.S. 199, 215-16 (2007); *Custis v. Davis*, 851 F.3d 358, 361 (4th Cir. 2017). Nevertheless, a claim that has not been exhausted may not be considered by this Court. *See Bock*, 549 U.S. at 220. In other words, exhaustion is mandatory. *Ross v. Blake*, 578 U.S. 632, 639 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. *Id.* (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall'…normally creates an obligation impervious to judicial discretion")).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d 717, 725, 729 (4th Cir. 2008); *see Langford v. Couch*, 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he…PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford*, 548 U.S. at 93 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)) (emphasis in original). But the Court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the

action or inaction of prison officials." *Aguilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

In Maryland prisons, the Administrative Remedy Procedure is the administrative process that must be exhausted. MD. CODE REGS. § 12.02.28.02(B)(1), (D) (2018). First, a prisoner must file an administrative remedy procedure request ("ARP") with the warden within 30 days of the incident at issue. MD. CODE REGS. § 12.02.28.05(D)(1) (requiring filing with the "managing official"); MD. CODE REGS. § 12.02.28.02(B)(14) (defining "managing official" as "the warden or other individual responsible for management of the correctional facility"); MD. CODE REGS. § 12.02.28.09(B) (setting the 30-day deadline). Second, if the ARP is denied, or the inmate does not receive a timely response, a prisoner must file an appeal with the Commissioner of Correction within 30 days. MD. CODE REGS. § 12.02.28.14(B)(5). If the appeal is denied, the prisoner must appeal within 30 days to the Inmate Grievance Office ("IGO"). MD. CODE. ANN., CORR. SERVS. §§ 10-206, 10-210; MD. CODE REGS. § 12.07.01.05(B). Inmates may seek judicial review of the IGO's final determinations in a Maryland Circuit Court. MD. CODE ANN., CORR. SERVS. § 10-210(a).

An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). In *Ross v. Blake*, the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." 578 U.S. 632, 635 (2016). Specifically, the Court rejected a "special circumstances" exception to the exhaustion requirement but reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" *Id*. at 635-36. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette,* 517 F.3d at 725.

An administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 578 U.S. at 642 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)).  Thus, an inmate must complete the prison's internal appeals process, if possible, before bringing suit.  *Chase v. Peay*, 286 F.Supp.2d 523, 529-30 (D. Md. 2003), *aff'd*, 98 Fed. App'x. 253 (4th Cir. 2004).  As a prisoner, Plaintiff is subject to the strict requirements of the exhaustion provisions.  *See Porter v. Nussle*, 534 U.S. at 528 (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct).  Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure.  *See Booth*, 532 U.S. at 741.

The *Ross* Court outlined three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play."  578 U.S. at 643. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Id.*  Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it."  *Id*. at 643-44. The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id.* at 644.

Defendants provide a declaration from F. Todd Taylor, Director of the IGO, attesting that an IGO complaint regarding the incident of February 15, 2023, was received from Plaintiff on March 15, 2023, six days after his Complaint was filed in this Court.  ECF 22-7 at ¶ 3.  The IGO complaint was dismissed for failure to exhaust administrative remedies after Plaintiff failed to

provide paperwork establishing that he had filed an ARP with the warden which he appealed to the Commissioner of Correction. *Id*. at ¶ 5.

Plaintiff attached a copy of his ARP filed with the Warden on February 23, 2023. ECF 6-1. Although Defendants take issue with the fact that Plaintiff does not mention any officers by name in his ARP, the content of his ARP was clear enough for the Warden to discern what the complaint was about and to dismiss the ARP for "procedural reasons." *Id*. Specifically, the ARP was dismissed using a rubber stamp which reads: "Dismissed for procedural reasons: Final per COMAR 12.02.2.11.B(h). This issue is being investigated by IID, case number: 23-35-00263."[1] *Id*. "Under Maryland law, an inmate cannot successfully file an administrative grievance over an event that is the subject of an Intelligence and Investigative Division investigation. If they do, that grievance will automatically be dismissed as procedurally deficient." *Younger v. Crowder*, 79 F.4th 373, 380 (4th Cir. 2023) (citing Md. Code Regs. § 12.02.28.11(B)). The *Younger* Court further observed that the PLRA does not require prisoner litigants to engage in futile efforts to somehow convince correctional officials and the IGO to ignore applicable law and consider their administrative remedy requests on the merits of the claim asserted. *Id*. To the extent that Mr. Taylor overlooked Maryland regulatory law and opted to dismiss Plaintiff's IGO complaint for a different reason, his oversight does not change the analysis: administrative remedies were not available to Plaintiff. Additionally, the fact that Plaintiff did not include any details in the ARP he filed regarding the alleged use of force incident does not change the fact that the merits of his ARP could not be addressed. Defendants' exhaustion defense fails.

---

[1] The case number is handwritten but the remainder of the response is a rubber stamp.

B.        Eighth Amendment

The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments." U.S. CONST. AMEND. VIII.  This prohibition "protects inmates from inhumane treatment and conditions while imprisoned."  *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).  The Eighth Amendment is violated when an inmate is subjected to "unnecessary and wanton infliction of pain."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  To establish an Eighth Amendment violation, an inmate must establish both that the prison official subjectively "acted with a sufficiently culpable state of mind" and that the injury or deprivation inflicted was objectively serious enough to constitute a violation.  *Williams*, 77 F.3d at 761.  On the subjective element, an inmate must show that the guards used force "maliciously or sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline."  *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)).  In assessing this element, a court should consider "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat;" and "(4) any efforts made to temper the severity of a forceful response."  *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008) (quoting *Whitley*, 475 U.S. at 321).

As for the objective level of harm, a party asserting an Eighth Amendment excessive force claim must demonstrate that the officer used a "nontrivial" amount of force.  *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010).  "[N]ot every malevolent touch by a prison guard gives rise to a federal cause of action."  *Id*. at 37 (quoting *Hudson*, 503 U.S. at 9).  Although inmates must show the application of nontrivial force, an Eighth Amendment violation can occur even if that force did not cause serious injury.  *Id*. at 38 ("[A]n inmate who is gratuitously beaten by guards does not lose his

15

ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.").  "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9.  The extent to which injuries are modest is accounted for in the award of damages. *See Wilkins*, 559 U.S. at 40.

Here, Plaintiff's account of the use of force against him is disputed by Defendants who support their version of events with undisputed video surveillance and declarations of the involved officers, which the video corroborates.  Plaintiff filed no response or opposition to the Motion and offers no explanation as to the absence of any depiction of Defendants slamming him on the floor or otherwise using inappropriate force against him, which – according to his complaint – should be observable on the video.  The video footage, like other evidence or exhibits, is construed in the light most favorable to Plaintiff, as the nonmovant.  *See Brooks v. Johnson*, 924 F.3d 104, 111 (4th Cir. 2019).  In *Scott v. Harris,* 550 U.S. 372, 380 (2007), a summary judgment case, the Supreme Court said that, when "opposing parties tell two different stories," one of which is blatantly contradicted by video evidence in the record, "so that no reasonable jury could believe it, a court should not adopt that version of the facts . . . ."  Rather, a court should "view[] the facts in the light depicted by the videotape." *Id.*; *see also Sawyer v. Asbury*, 537 F. App'x. 283, 291 (4th Cir. 2013).

In *Witt v. West Virginia State Police, Troop 2*, 633 F.3d 272 (4th Cir. 2011), a summary judgment case, the Court observed that the principle articulated in *Scott* does not license a court to reject one side's account as a matter of law if the "documentary evidence, such as a video," merely "offers *some* support for [the other side's] version of events." *Id.* at 276 (emphasis in original). Rather, the video controls only where it "'blatantly contradict[s]'" one side's testimonial account. *Id*. (quoting *Scott*, 550 U.S. at 380).  But, "[i]ncontrovertible evidence relied on by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the

court" when resolving a summary judgment motion "if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party." *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) (applying *Scott* in context of motion for judgment as a matter of law).

As noted, Plaintiff does not challenge the accuracy or authenticity of the video surveillance, which wholly discredits his account of the encounter with these Defendants.  It is undisputed that Plaintiff was engaged in a fight with his cellmate, and once the objective of stopping the fight was accomplished, no inappropriate force was utilized.  Although Plaintiff implies he was left to suffer in a cell where he was having seizures, there is no dispute of fact that shortly after Plaintiff was returned to his cell, he was brought back to the medical unit (because he was unresponsive).  The undisputed records document that the initial incident occurred at approximately 11:48 a.m. and Plaintiff was brought back to the medical unit at 12:20 p.m.  ECF 22-3 at 5 ("At approximately 1220 hours . . . Perez-Lopez . . . suffered a medical incident inside of his cell and was transported to West Medical via stretcher.").  Plaintiff has failed to generate a  genuine dispute of material fact and failed to offer any evidence to support his Eight Amendment claim; and the undisputed facts objectively demonstrate that no inappropriate force was utilized against him by Defendants. Accordingly, Defendants are entitled to summary judgment in their favor.

## CONCLUSION

For the reasons stated, Defendants' Motion, construed as one for summary judgment, shall be granted by separate Order which follows.

/S/

October 25, 2024

_____
Julie R. Rubin
United States District Judge